**VINNIE'S WHOLESALE FISH MARKET, INC., Plaintiff,**

v.

**CANADIAN MARINE UNDERWRITERS LIMITED, Defendant.**

**Civ. A. No. 75–2650–C.**

United States District Court,
D. Massachusetts.

Dec. 12, 1977.

Morris D. Katz, Boston, Mass., for plaintiff.

Leo F. Glynn, Glynn & Dempsey, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in admiralty for breach of a contract of marine insurance. Jurisdiction is based on 28 U.S.C.A. § 1333. Plaintiff is a corporation organized under the laws of the State of New York. Defendant is a Canadian corporation.

Plaintiff alleges that it was the owner of a fishing vessel which foundered and sank off the coast of Honduras during a hurricane in September of 1974. Plaintiff further alleges that at the time of the sinking, the vessel was covered by a policy of hull and protection and indemnity (P & I) insurance issued by the defendant. Plaintiff seeks to recover a judgment in the amount of $65,000—the face value of the hull policy—plus interest and costs. The case was tried to the Court without a jury. The parties have filed requests for findings and rulings, and, pursuant to Fed.R.Civ.P. 52(a), I find and rule as follows.

Plaintiff purchased a 93-foot fishing vessel, "Lady of Good Voyage," on May 11, 1974, at a cost of $61,500. At or about the time of purchase, one Vincent Palermo was sole owner of the common stock of the plaintiff corporation. Palermo requested a friend, Al Catalina, to arrange for the placing of insurance on the vessel. Catalina requested a one-year policy, in the amount of $65,000 for hull insurance and $300,000 for P & I insurance, from Mariners Insurance Agency, Inc. (Mariners), a corporation organized under the laws of Massachusetts.

The request for insurance was processed by Richard Flood, Vice President of Mariners. He and his father, Ernest Flood, President of Mariners, both testified at the trial.

Subsequent to the issuance of the policy of insurance, the vessel embarked on a fishing trip to be conducted near Honduras. Upon arrival in that area in early June of 1974, the captain and crew discovered that the water depths in the vicinity of Honduras rendered the equipment aboard the ship unsuitable for their usual type of fishing. The crew then moored the vessel a mile or two off the island of Utila, using a 300- and 500-pound anchor. After anchoring the vessel, the five-man crew returned to their homes in Gloucester, leaving the vessel in the custody of a local watchman.

■ There was evidence, and I find, that because of the shallowness of the water surrounding the island of Utila, there was no dock or pier on that island with water of an adequate depth to permit either docking or tying the vessel to a wharf or pier. Under those circumstances, I find that the described mooring of the vessel with the two anchors amounts to her being "in port," within the meaning of the language contained in lines 189–90 of the insurance policy. In so ruling, I have in mind that the only alternative to her being "in port" is her being "at sea." It strains credulity to argue that the vessel was at sea while anchored fore and aft in shallow water with no crew aboard. This is particularly so since the ship had been so anchored for several months prior to her loss. I further find that while the vessel was so moored, "Hurricane Fifi" struck the Honduran coast and caused a total loss of the vessel on September 19, 1974.

Turning to the circumstances surrounding the issuance and claimed cancellation of the insurance policy, I find that on June 13, 1974, Richard Flood, acting for Mariners, sent an invoice dated May 26, 1974 to Palermo. This invoice, which was for total premiums in the amount of $11,237.09, covered a one-year policy for face amounts of $65,-000.00 hull insurance and $300,000.00 P & I insurance. Enclosed with that invoice were two copies of a promissory note to be executed by the insured in the amount of $8,000.00, as well as a notice that the insured was to make a premium downpayment of $3,237.09. On the same day, Mariners also sent to Palermo an invoice for an additional $113.75 for port risk, hull, and P & I insurance. A policy of insurance, effective at noon on May 28, 1974 and running until noon on May 28, 1975, also was prepared by Mariners. I find that this policy was never delivered to Palermo and was retained in the possession of Mariners at all pertinent times. On June 6, 1974, an endorsement effective May 28, 1974 was added to the policy covering the trip from Gloucester to Honduras at an extra premium of $650.00.

In a letter accompanying the invoices and note, Richard Flood requested Palermo to execute the green copy of the note and return it as soon as possible with his check for $3,237.09, plus the $113.75 premium for port risk. On July 16, 1974, Richard Flood sent substantially the same letter to Palermo, again requesting return of the executed note and a check in the total amount of $3,350.84. On August 2, 1974, Palermo drew a check on Palermo's Market, Inc., in the amount of $3,350.84 and remitted it to Mariners. Receipt of this check was acknowledged for Mariners by Ernest Flood in a letter sent to Palermo under date of August 7, 1974. In that letter, Ernest Flood advised Palermo that Mariners had not received the $8,000.00 promissory note, enclosed a new note for Palermo's signature, and explained Mariners' intention to discount that note at a local bank after its execution by Palermo. Ernest Flood also requested the $1,000.00 regular monthly payment on the note which was overdue as of June 28, 1974.

On September 4, 1974, Ernest Flood, for Mariners, sent a letter by certified mail to Palermo which amounted to a notice of cancellation of insurance for Palermo's non-payment of the premium. The letter also explained that if $2,080.00 was paid as outlined in Mariners' letter of August 7, the policy would be reinstated. A receipt for

this certified letter was placed in evidence. The receipt, dated September 11, 1974, was signed by "Rose Cashier." There was testimony that a person named "Rose" was the cashier at the Ocean Fish Company, 3508 30th Avenue, Astoria, New York, and I find that the signature, "Rose Cashier," on the receipt is that of Palermo's employee, named Rose. I further find that the sending of this letter by certified mail, together with the signature of his cashier, establishes actual notice to Palermo of the cancellation of the policy. Rose was not shown to be unavailable at the time of trial. Consequently, because of plaintiff's failure to produce her as a witness at the trial or as a witness on deposition, I draw the inference that her testimony, had she been called as a witness, would have been adverse to the interests of Palermo.

I do not believe that Palermo executed the $8,000.00 promissory note and returned it to Mariners, despite his testimony to that effect, unsupported as it is by any documentation tending to establish that the note was signed and returned.

Plaintiff challenges the validity of the attempted cancellation because of the following language which appears at lines 186–90 of the policy.

> This policy may be cancelled at any time by this Company. Written notice mailed to the assured at his or their last known address shall constitute a complete notice of cancellation and this Policy shall be null and void at noon on the fifth day after such notice shall have been mailed; provided, however, that if the insured Vessel has not been in any port within said period the cancellation shall take effect at 12:00 noon Eastern Standard Time on the first day after her first arrival in any port.

As indicated above, I find both that the vessel "Lady of Good Voyage" was "in port" for purposes of the language contained in the policy, and that she was in port as of June, 1974, because of her being anchored as described and abandoned by her crew. Any other finding would give plaintiff the benefit of an uncancelable policy of insurance, a condition which clearly was never contemplated by either party to the contract of insurance.

■ Several legal contentions of the parties need be briefly discussed. Plaintiff claims that non-delivery of the policy estops its cancellation, citing *Frieze v. West American Ins. Co.,* 188 F.2d 331 (8th Cir. 1951). I rule that neither delivery nor actual possession by the insured is essential to the making of an insurance contract unless the contract expressly sets out a requirement of delivery. *See Pacific Mutual Life Ins. Co. v. Barton,* 50 F.2d 362 (5th Cir.), *cert. denied,* 284 U.S. 647, 52 S.Ct. 29, 76 L.Ed. 550 (1931). In *Frieze, supra,* a California statute expressly required delivery of the policy. No such statutory provision is involved herein. Moreover, it is established that delivery of a policy to a broker employed by the insured to procure that policy constitutes delivery to the insured. *Tarleton v. De Veuve,* 113 F.2d 290 (9th Cir.), *cert. denied,* 312 U.S. 691, 61 S.Ct. 710, 85 L.Ed. 1127 (1940). In this case, delivery to Mariners constituted delivery to plaintiff, and, even if Mariners was agent for both parties, that fact is not material. *See Michelson v. Franklin Fire Ins. Co.,* 252 Mass. 336, 147 N.E. 851 (1924).

■ Defendants argue that the policy was cancelled as of July 26, 1974, because of noncompliance by plaintiff with the premium payment provisions of lines 43–48 of the policy, which provide:

> In the event of non-payment of premium within sixty days after the date of attachment, this Policy shall automatically terminate upon such sixtieth day, at noon E.S.T., and it is agreed by the assured that no further notice of the termination or cancellation of this Policy is or shall be necessary.

I rule that this contention of defendant is not valid because of defendant's acceptance of a partial payment of premium on August 2. This acceptance of the partial premium amounts to a waiver of any prior cancellation and a reinstatement of the policy. *See Chicago Insurance Co. v. Camors,* 296 F.Supp. 1335 (N.D.Ga.1969), *aff'd per curiam,* 420 F.2d 376 (5th Cir. 1970).

**345**

 I rule that there is no legal merit in plaintiff's claim that Mariners failed to comply with the policy requirements for cancellation on the grounds of nonpayment of the premium. The policy expressly provides that mailing of a letter of cancellation constitutes a "complete notice of cancellation." (Lines 186–90). *See Farber v. Great American Ins. Co.*, 406 F.2d 1228 (7th Cir. 1969). Additionally, as indicated above, I find that Palermo, through the medium of the certified letter, had actual notice of the cancellation of the policy as of September 11, 1974. The notice of cancellation, which was mailed on September 4, 1974, became effective five days thereafter, *i.e.*, on September 9, 1974. Because September 9, 1974 antedated the destruction of the fishing vessel in port, I find that "Lady of Good Voyage" was uninsured when "Hurricane Fifi" struck.