Paul A. GARGANO and Gargano & Associates, P.C., Plaintiffs

v.

LIBERTY INTERNATIONAL UNDERWRITERS, INC., Greenwich Insurance Company, and NCMIC Insurance Company, Defendants.

Civil Action No. 08–11058–WGY.

United States District Court, D. Massachusetts.

Sept. 9, 2008.

Paul A. Gargano, Gargano & Associates, Cambridge, MA, for Plaintiffs.

William T. Bogaert, Peri B. Karger, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, David A. Grossbaum, Andrew M. Schneiderman, Hinshaw & Culbertson LLP, Brooks L. Glahn, Alexandra B. Harvey, Adler, Cohen, Harvey, Wakeman & Guekguezian LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiffs, attorney Paul Gargano ("Gargano") and the law firm of which he is principal, Gargano and Associates, P.C. ("the Firm"), sue three separate insurance companies: Liberty International Underwriters, Inc. ("Liberty"), Greenwich Insurance Company ("Greenwich"), and NCMIC Insurance Company ("NCMIC") (collectively, "the Defendants"). Gargano obtained legal professional liability policies from the Defendants and now alleges that they failed to investigate, indemnify, and defend him as provided for in the policies after he made a claim for coverage. He seeks to recover as to each of the Defendants for breach of contract, a violation of Massachusetts General Laws chapter 176D section 3, and a violation of Massachusetts General Laws chapter 93A. The Defendants move to dismiss the suit for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Procedural Posture

Gargano filed this suit in the Massachusetts Superior Court sitting in and for the County of Suffolk in May 2008. Notice of Removal [Doc. 1] at 1; Summons [Doc. 1 Ex. A] at 1. Liberty removed the suit to this Court on June 23, 2008. NCMIC concurrently filed a notice of consent to removal.[1] NCMIC Consent [Doc. 1 Ex. D] at 1.

Greenwich filed a motion to dismiss [Doc. 8] and its memorandum in support thereof [Doc. 11] on June 30, 2008. NCMIC also filed on that date its motion to dismiss and supporting arguments [Doc. 12]. Finally, Liberty filed a motion to dismiss or, in the alternative, to sever and stay the chapter 93A claim [Doc. 9] and a memorandum in support [Doc. 10]. Gargano filed a single memorandum in opposition designed to respond to all three Defendants' motions to dismiss [Doc. 20] on July 25. Gargano also filed an affidavit [Doc. 18] on his behalf on that same date.

On August 26, Liberty filed a reply [Doc. 31]. Greenwich did the same on August 29 [Doc. 32].

### B. Facts

Gargano is an attorney and is the principal of the Firm, which is located in Cambridge, Massachusetts. Compl. [Doc. 1 Ex. A] ¶¶ 1–2. Gargano obtained from NCMIC a legal professional liability policy that covered himself as well as the Firm for the period spanning September 1, 2004 to September 1, 2005. *Id.* ¶ 13. Gargano chose not to renew that policy at its expiration and instead obtained a policy from Greenwich, which was in effect from September 1, 2005 until September 1, 2006. *Id.* When the Greenwich policy expired, Gargano chose to obtain the next year of coverage—from September 1, 2006 to September 1, 2007—from Liberty. *Id.*

Although the policies issued by the Defendants are not exactly the same, they are virtually identical in the aspects rele-

---

**1.** At the time of removal, Greenwich, unlike Liberty and NCMIC, had not been served with a summons and copy of the complaint. No- tice of Removal at 2. This may explain why Greenwich, unlike NCMIC, did not file a notice of consent to removal.

vant to this action. Specifically, all three polices are "claims made and reported" policies. The defining characteristic of this type of policy is that it provides coverage *only* for claims that are *both* first made against the insured and reported to the insurance company during the term of the policy. NCMIC Policy [Ex. A to Compl.] at 1; Greenwich Policy [Ex. B to Compl.] at 1; Liberty Policy [Ex. C to Compl.] at 1.[2] All three also have exclusions that bar coverage for claims arising out of fraudulent, dishonest, or malicious conduct on behalf of the insured. NCMIC Policy at 5; Greenwich Policy at 14; Liberty Policy at 11.

In 2005, while the NCMIC policy was in effect, Gargano and his law firm were sued by Christopher Hug ("Hug"). Compl. ¶ 15. Hug, an attorney, represented a third party, Anthony Pirelli ("Pirelli"), in the context of a worker's compensation claim. *Christopher N. Hug v. Gargano & Associates, P.C., Paul Gargano, and Lib-* *erty Mutual,* 2007 WL 4358191, at *1 (Mass.Super.2007) (Sanders, J.).[3] Hug alleged that, when Pirelli hired him, Pirelli signed a contingency fee agreement under which Hug would receive twenty percent of any lump sum recovery. *Id.* Hug represented Pirelli for four years, during which he assisted Pirelli in obtaining interim benefits and negotiated with the workers' compensation insurer with the goal of increasing its settlement offer. *Id.* Hug was successful in this latter effort, as the workers compensation insurer increased its offer from $55,000 to $200,000. *Id.* at *2.

In March 2004—before any settlement offer was accepted—Pirelli fired Hug and hired Gargano and the Firm to represent him. *Id.* Hug timely provided a copy of Pirelli's file to Gargano. *Id.* He then took steps to ensure that, since he had been relying on a contingency fee, he would be compensated for the time that he had actually devoted to Pirelli's case. First, Hug

---

**2.** Because Gargano both referenced the policies in and attached them as exhibits to the Complaint, this Court may properly consider them when evaluating the motions to dismiss. *See, e.g., Cogan v. Phoenix Life Ins. Co.,* 310 F.3d 238, 241 n. 4 (1st Cir.2002) (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)).

**3.** Although a Court may not normally consider documents outside the complaint when evaluating a motion to dismiss without converting it to a motion for summary judgment, *see* Advisory Committee Notes to Fed.R.Civ.P. 12(b)(6); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993), "courts have made narrow exceptions to this rule for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson,* 987 F.2d at 3 (collecting cases).

The opinion issued by the Massachusetts Superior Court fits comfortably within these exceptions. It plays a central role in the case because Gargano's claim for coverage under the policies issued by the Defendants oc- curred only after this opinion, which found Gargano liable to Hug, was issued. Compl. ¶¶ 16–17. Furthermore, Gargano refers to the opinion, specifically that portion assessing damages against him in the amount of $102,819.72, in the Complaint. Compl. ¶ 16; *see also Airframe Sys., Inc. v. Raytheon Co.,* 520 F.Supp.2d 258, 263 (D.Mass.2007) ("[W]here the plaintiff has referenced part of a document in the complaint, it is proper for the court to view the rest of that document so as to be able to understand it in context."). In addition, the opinion is a public document whose authenticity is not questioned. *See id.*

Finally, the policy providing the basis of the general rule against looking outside the complaint is to prevent unfair surprise to the plaintiff. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). Here, however, Gargano is undoubtedly familiar with the contents of the Massachusetts Superior Court's opinion. Thus, there is "no concern that their use at this time will result in unfair surprise." *Airframe,* 520 F.Supp.2d at 263.

spoke with an associate at the Firm, who expressed interest in settling the matter by paying a "referral fee." *Id.* Second, Hug filed a Notice of Attorney's Lien with the Department of Industrial Accidents; he also sent copies of the notice to the worker's compensation insurer, Pirelli, and the Firm. *Id.* On June 14, 2004, Hug again filed his Notice of Attorney's Lien and again sent copies to all relevant parties.[4] *Id.*

As of January 2005, Hug had heard nothing about the Pirelli matter, so he contacted the worker's compensation insurer and learned that a lump sum payment had been made on June 10, 2004. *Id.* The Department of Industrial Accidents approved a payment of attorneys' fees in the amount of $58,760 to the Firm after (1) Pirelli signed under oath a form certifying no liens for reimbursement existed on the proceeds of the lump sum award and (2) Pirelli submitted a typewritten affidavit falsely stating that Gargano and the Firm had been the only attorneys to represent Pirelli on his worker's compensation claim. *Id.* The worker's compensation insurer asked Gargano about Hug's lien prior to sending the Firm the check for attorneys' fees and actually faxed Gargano a copy of the notice of the lien it had received. *Id.* Gargano "assured" the insurer that he would "deal directly with Hug about his lien." *Id.* When Hug made repeated efforts to contact Gargano about this issue, however, he was ignored. *Id.*

After a hearing, the Massachusetts Superior Court found the above facts, noting that Hug's allegations were "essentially uncontested." *Id.* at *1 n. 2 (observing that Gargano did not testify nor call any witnesses to contest Hug's factual allegations). The court then ruled that Gargano

and the Firm were obligated to provide fair and reasonable compensation for Hug's services to prevent unjust enrichment. *Id.* at *4. The Court ruled that Hug's share of the attorneys' fee award in the Pirelli matter was $24,967; it also made a chapter 93A award of treble damages in the amount of $49,934 and attorneys' fees in the amount of $27,918. *Id.* at *4–5. As evidence of Gargano's "intentional and willful" unfair and deceptive trade practices, the Court cited the "numerous misrepresentations or material omissions of fact" Gargano had made, including directing Pirelli to represent that there was no attorneys' lien and that Gargano had always been his attorney, failing to notify the Department of Industrial Accidents that a lien existed, and assuring the worker's compensation insurer that he would satisfy Hug's lien in order to obtain the entirety of the attorney fee award. All told, the damages awarded to Hug totaled $102,819.72. *See id.* at *5.

Significantly, Gargano did not notify any of the Defendants of the lawsuit in the Superior Court when it was served upon him in 2005 nor at any time during the proceedings. *See* Compl. ¶ 17. Obviously, therefore, Gargano made no demand to investigate, defend, or indemnify the suit on any of the Defendants prior to the entry of the Superior Court's judgment; indeed, the Firm assumed the defense of the lawsuit itself. *See Hug,* 2007 WL 4358191, at *1 n. 2. The first time Gargano told the Defendants of his claim for coverage was after the Superior Court judgment issued in 2007. *Compl.* ¶ 17. At that time, Gargano demanded that the Defendants indemnify him as to the damages award, *id.,* as well as investigate the claim and defend him with regard to his pending appeal, *see id.* ¶ 18.

---

4. The court found that Gargano and the Firm received these notices in part because they were sent via certified mail.

The Defendants denied coverage, primarily because they assert that the claim failed to satisfy the "claims made and reported" requirement present in their policies. In particular, because Gargano did not report the claim to any of the Defendants until 2007, NCMIC and Greenwich assert that coverage is barred because the claim was not reported during their terms of coverage.[5] Compl. ¶¶ 19–20; *see also* NCMIC Mem. in Supp. at 8–10; Greenwich Mem. in Supp. at 5–7. Liberty admits the claim was reported during the term of its coverage but asserts the claim was first made against Gargano when the lawsuit was filed in 2005, thus falling outside the scope of its policy. Compl. ¶ 21; *see also* Liberty Mem. in Supp. at 12–16.

Gargano alleges he has been harmed by the denial of coverage because (1) he has been forced to continue bearing the cost of litigating his appeal; (2) he has been forced to institute the instant action, and (3) he has been forced to borrow against his securities portfolio in order to post $110,000 to secure the judgment of the Superior Court. Compl. ¶ 22.

### C. Federal Jurisdiction

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## II. ANALYSIS

### A. Chapter 176D

Gargano asserts a claim for a violation of Massachusetts General Laws chapter 176D section 3 against each of the three Defendants. Chapter 176D section 3 defines various activities that constitute "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." Mass. Gen. L. ch. 176D § 3. It does not, however, create an independent private cause of action. *See, e.g., Ryan v. Fallon Community Health Plan, Inc.*, 921 F.Supp. 34, 38 (D.Mass.1996) (Gorton, J.) (collecting cases). At most, evidence that a defendant has committed an act enumerated in chapter 176D would provide a basis for seeking relief under chapter 93A.[6]

Even Gargano appears to concede that a chapter 176D claim cannot stand on its own, noting that "claims under chapter 176D are subsumed within chapter 93A." Pl.'s Mem. in Opp. at 14.[7] Accordingly, the Court grants the Defendants' motions to dismiss the chapter 176D claims, which are reflected in counts IV, V, and VI of the Complaint.

### B. Breach of Contract

Gargano alleges that the Defendants' failure to investigate, indemnify, and defend him and the Firm with regard to the Hug judgment and its appeal constitutes a breach of the professional liability insurance contracts into which they entered. Compl. 24–28. In response, the Defendants assert that there can be no breach of contract because the policies clearly state

---

5. Greenwich also points out that, whether the claim is considered to have arisen at the time the lawsuit was filed or at the time judgment was entered, neither event occurred while its policy was in effect. Therefore, it asserts, neither prong of the "claims made and reported" requirement is satisfied.

6. This point will be discussed more fully *infra* in the context of evaluating the sufficiency of Gargano's chapter 93A claims.

7. Furthermore, the one case Gargano cites in support of his chapter 176D claim explicitly states that chapter 176D "provides no remedy for individuals injured by unfair or deceptive insurance practices." *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 75, 365 N.E.2d 802 (1977).

that there is no coverage unless both the following statements are true: (1) the claim first arose during the policy period and (2) the insured reported the claim to the insurance company during the policy period. NCMIC Policy at 1; Greenwich Policy at 1; Liberty Policy at 1. They argue that the alleged facts in this case, even if taken as true, demonstrate that in no instance were both of these requisites satisfied. In the alternative, the Defendants point to exclusions in their policies that clearly bar coverage for claims that arise out of the dishonesty or fraudulent conduct of the insured, which, given the findings of the Superior Court, they argue precludes coverage for Gargano's claim. NCMIC Mem. in Supp. at 11–14.

Gargano does not dispute the contents of the policies. He does, however, argue the Defendants should not be permitted to rely upon the policy language to deny coverage in his case due to the fact that he did not receive a copy of any of the policies until after the Superior Court judgment was entered. Compl. ¶¶ 19–21. Gargano asserts that "Massachusetts require[s] the delivery of insurance policies before policy language can be asserted to defeat policyholders' claims." Pl.'s Mem. in Opp. at 10.

An evaluation of the law demonstrates that Gargano is incorrect. Courts squarely addressing this issue under Massachusetts law have held that "neither delivery nor actual possession by the insured is essential to the making of an insurance contract unless the contract expressly sets out a requirement of delivery." *Vinnie's Wholesale Fish Market, Inc. v. Canadian Marine Underwriters, Ltd.*, 441 F.Supp. 341, 344 (D.Mass.1977) (Caffrey, C.J.); *see also Aguiar v. Generali Assicurazioni Ins. Co.*, 47 Mass.App.Ct. 687, 690, 715 N.E.2d 1046 (1999) (rejecting argument that insurers should be estopped from denying coverage where insured did not receive actual

text of policy in part because "an insured is charged with his agent's knowledge [in this case, an insurance broker through which the insured bought his policy] of the terms and conditions of an insurance policy"); *Medical Professional Mut. Life Ins. Co. v. Steinberg*, 2006 WL 1096794, at *7 (Mass.Super.2006) (Garsh, J.) (stating that it is "immaterial" whether an insurance broker fails to notify an insured of the terms of an insurance policy and that, even in that instance, "an insured is charged with his agent's knowledge of the terms and conditions of an insurance policy").

Gargano's attempts to undermine this authority are ineffective. This is especially obvious with regard to *Vinnie's Wholesale Fish*. There, an insured argued that an insurance company should not be permitted to rely upon a cancellation clause in the insurance contract and to cancel his policy where the text of the policy was never delivered to him. *See Vinnie's Wholesale Fish*, 441 F.Supp. at 344. As discussed above, the district court flatly rejected the proposition that delivery of the policy was required in order for the insurance company to invoke its terms. Gargano asserts that the district court reached this conclusion because "the policyholder unquestionably received proper notice of the cancellation [and] here, by contrast, the three insurers rely on policy language that was not delivered." Pl.'s Mem. in Opp. at 9. This, however, draws a false distinction. Just as here, the insurance company in *Vinnie's Wholesale Fish* relied upon policy language—in that case, a cancellation clause—contained in a contract that was never delivered to the insured. The "proper notice of the cancellation" in *Vinnie's Wholesale Fish* is analogous to the notice of denial of coverage that Gargano has received in this case. In other words, the insured was "unquestionably" notified of the insurance company's decision to take an adverse ac-

tion in both instances, but neither plaintiff received the text of the policy upon which the insurance companies relied when taking that adverse action. In sum, there is no significant difference in the facts of *Vinnie's Wholesale Fish* that render it inapplicable to the instant case, as Gargano claims. *See id.*

Furthermore, the district court in no way relied upon the notice given to the insured of the adverse action in reaching its decision. Rather, it simply stated that delivery of the policy to the insured was not required in order to create a binding insurance contract, especially because "delivery of a policy to a broker employed by the insured to procure that policy constitutes delivery to the insured." *Vinnie's Wholesale Fish,* 441 F.Supp. at 344. This principle accords with the holdings of the Massachusetts courts that an insured is charged with his broker's knowledge of the terms of an insurance policy and proves incorrect Gargano's assertion that *Vinnie's Wholesale Fish* does not follow Massachusetts law. *See* Pl.'s Mem. in Opp. at 9.

Gargano's attack on *Aguiar* is similarly unpersuasive. Gargano asserts that the decisive factor in *Aguiar* was that the contents of the policy were dictated by statute such that the policyholders should have been on notice of the terms even if they had not received the actual text of their policy from their insurance company. *Id.* at 9–10, 715 N.E.2d 1046. The *Aguiar* court, however, cited the statutory content requirement as only one of *two* independent reasons for its holding, the other being that "an insured is charged with his agent's knowledge of the terms and conditions of the insurance policy." *Aguiar,* 47 Mass.App.Ct. at 690, 715 N.E.2d 1046. Furthermore, with regard to the statutorily prescribed content, the Court reasoned that the insureds could be presumed to be on notice of the terms because they "would

have appeared in every fire policy that the plaintiffs had read, *assuming they had read one.*" *Id.* (emphasis added). Similarly, because the defining characteristic of a "claims made and reported" policy is the requirement that a claim be both made against the insured and reported to the insurance company during the period of the policy, *see Chas T. Main, Inc. v. Fireman's Fund Ins. Co.,* 406 Mass. 862, 865, 551 N.E.2d 28 (1990), this provision would have been in any "claims made and reported" policy Gargano read, "assuming he had read one." Thus, although the content of the "claims made and reported" policy is not prescribed by statute, the *Aguiar* court's reasoning on that point, if anything, supports a decision for the Defendants in this case.

Finally, the cases cited by Gargano do not evidence that, in the absence of policy delivery, a court must rule in favor of an insured in the scenario present in the case at bar. Instead, the cases cited by Gargano stand for the general proposition that, where a policy has neither been delivered nor a premium paid, there was no binding contract because the agreement had not been "consummated." *Cunningham v. Connecticut Fire Insurance Co.,* 200 Mass. 333, 337, 86 N.E. 787 (1909); *see also Larsen v. Metropolitan Life Ins. Co.,* 289 Mass. 573, 194 N.E. 664 (1935); *Markey v. Mutual Benefit Life Ins. Co.,* 118 Mass. 178 (1875); *Hoyt v. Mutual Benefit Life Ins. Co.,* 98 Mass. 539 (1868). That is not the case here. Gargano paid the premiums and, in all cases, knew the "essential elements" of the policies, such as against whom to make a claim and the length of the coverage. *See Cunningham,* 200 Mass. at 336, 86 N.E. 787. This case, therefore, is distinguishable from those relied upon by Gargano. In each of the cases cited by Gargano, furthermore, the fact that the insurance policy was nonbinding, in part due to nondelivery, led the

Court to conclude that the insurer was not bound to provide coverage and thus to enter judgment for the *defendant.* *See* cases cited *supra.*

The final case, *Gabbett v. Connecticut General Life Ins. Co.,* 303 Mass. 433, 21 N.E.2d 950 (1939), is distinguishable on its facts and similarly does not support Gargano's characterization of Massachusetts law. There, an plaintiff submitted an application for insurance at the end of September 1936 and knew that the policy, if her application was accepted, would not take effect until October 30. In mid-October, however, the insured had surgery, which rendered some of her statements on her insurance application false. Id. at 433–34, 21 N.E.2d 950. The *Gabbett* court ruled that the insurance company could void the insurance contract upon learning of the plaintiff's surgery because, as of the time her surgery occurred, her application was still pending and she had a duty to update her statements. *Id.* at 436–36, 21 N.E.2d 950. Although the court did state that the "policy of insurance as a contract did not become operative until the offer of the plaintiff by way of her application was accepted by the defendant, and the policy was delivered as of its effective date," this does not establish a rule that requires Gargano to prevail as a matter of law. First, the context of the case is completely different: *Gabbett* is not at all about an insurance company relying on contents of a policy that was not delivered to the insured to deny coverage; rather, the fact

that the policy was not delivered was relevant only insofar as it demonstrated the plaintiff's application had not yet been accepted and thus that she had a duty to update her application. Second, *Gabbett* does not require that the policy be delivered *personally* to the insured and thus does not detract from the precedent discussed above that holds delivery of a policy to an insurance broker constitutes delivery to the insured. Finally—and most importantly—in *Gabbett,* just as in all the cases discussed above, the finding that there was no operative insurance contract required a judgment for the insurance company, not the plaintiff. *See id.* at 437, 21 N.E.2d 950.

In sum, Gargano repeatedly makes blanket assertions about what Massachusetts law requires but fails to provide any authority that actually stands for the proposition that he cannot be bound by the terms of the policies he purchased from the Defendants. Indeed, were the Court to accept the authority cited by Gargano (despite the important factual differences from the case at bar), it would apparently be required to enter judgment for the Defendants on the theory that there is no obligation to provide coverage due to the fact that non-delivery precluded the creation of a contract. Given the context of this case, however, it is obvious that there are at least three decisions under Massachusetts law [8] on point that hold delivery of a insurance policy to a plaintiff insured

---

**8.** Gargano cites to cases decided under the law of other states in an effort to bolster his position. As an initial matter, this Court is bound in this case by the law of Massachusetts. Furthermore, the cases Gargano cites may not be as helpful to his cause as he suggests. For instance, the court in *Kozlik v. Gulf Insurance Company,* 268 Wis.2d 491, 673 N.W.2d 343 (Ct.App.2003), noted that delivery of the policy is not required for it to be effective if an insured is otherwise notified of its contents. *Id.* ¶ 15. Massachusetts law, meanwhile, makes clear that an insurance broker's knowledge of the contents of an insurance policy is imputed to an insured. Accordingly, even under *Kozlik*—an authority on which Gargano relies—delivery of the policy would not be required here because Gargano utilized an insurance broker and thus had as matter of law constructive knowledge of the policies.

is not required for it to become effective and that an insured is considered to have constructive knowledge of an insurance policy that is held by the broker or agent through which he obtains the policy.

■ Here, it is undisputed that Gargano bought the policies from insurance brokers. Compl. ¶ 14 (stating that Gargano purchased the polices through insurance agencies); Pl.'s Mem. in Opp. at 3 (identifying brokers as Aon and Amity). Gargano, furthermore, does not contend that any of the policies contained clauses that made their effectiveness contingent on delivery. Accordingly, under the *Vinnie's Wholesale Fish*, *Aguiar*, and *Medical*, Gargano was charged with the insurance agent's knowledge of the terms and conditions of the policies. The fact that he did not obtain the text of the policies until a later date does not render them ineffective nor estop the Defendants from invoking their terms.[9] Accordingly, despite his bluster to the contrary, the fact that Gargano alleges he did not receive the text of the policies until after the Hug judgment does not preclude this Court from enforcing their terms.

This, however, does not end the matter. The Court must still evaluate whether the Defendants were obligated to provide coverage under the insurance contracts. Each Defendant will be addressed in turn. It will be helpful to keep in mind two important dates for the following discussion: March 2005 (the date Hug instituted his lawsuit) and July 2007 (the date the judgment was entered). The Court also keeps in mind that courts applying Massachusetts law have recognized the validity

of "claims made and reported" insurance policies and have held that failure to report the claim within the term of the policy is sufficient to entitle the insurer to deny coverage. *National Union Fire Ins. Co. v. Talcott*, 931 F.2d 166, 168 (1st Cir.1991).

### 1. Greenwich

■ The Greenwich policy was in effect from September 1, 2005 to September 1, 2006. Neither the institution of the lawsuit nor the Superior Court judgment occurred during this time frame. Thus, regardless of what event one considers to constitute Hug's claim against Gargano, on neither date would Hug's claim have been made during the term of the Greenwich policy. Furthermore, it is undisputed that Gargano did not report the claim to Greenwich until 2007, after the policy expired. Accordingly, under the "claims made and reported" term of the Greenwich policy, Greenwich is under no contractual obligation to provide coverage.

Furthermore, the Greenwich policy states that it does not apply to "[a]ny claim arising out of a criminal, intentionally wrongful, fraudulent, or malicious act or omission." Greenwich Policy at 14. Hug's suit, meanwhile, was based on actions that the Superior Court found to be intentionally and willfully fraudulent.

For these reasons, the breach of contract claim against Greenwich, reflected in count II of the complaint, is dismissed.

### 2. NCMIC

■ The NCMIC policy was in effect from September 1, 2004 to September 1,

---

**9.** To the extent that Gargano asserts the "clear and entirely reasonable expectation by [Gargano and the Firm] that they were covered," that rationale has been rejected in similar circumstances. *See Aguiar*, 47 Mass.App. Ct. at 690–91, 715 N.E.2d 1046. Furthermore, it is unreasonable to expect that purchasing an insurance policy means that coverage will be available in *every* circumstance. Anyone who has dealt with *any* type of insurance policy—medical, auto, or legal—knows that there are certain procedures with which one must comply in order to have a claim honored and that exclusions of coverage are inherent in any insurance policy.

2005. Under the terms of the NCMIC policy, a claim "include[s] the service of suit." NCMIC Policy at 3. As the Hug lawsuit was instituted in March 2005, it is apparent that, under the terms of the policy, the first prerequisite to coverage—that a claim first be made against the insured during the period of coverage—is satisfied. Gargano, however, failed to satisfy the second prerequisite because he did not report the Hug lawsuit to NCMIC during the term of coverage; indeed, it was not notified of the lawsuit until two years after Gargano's policy expired. Furthermore, the NCMIC policy contains an exclusion precluding coverage for claims "based on or arising out of any actual or *alleged* dishonest, fraudulent, criminal or malicious act." NCMIC Policy at 5. As these circumstances make clear, NCMIC has no contractual obligation to provide coverage to Gargano on his claim.

■ Gargano attempts to assert that NCMIC cannot rely on a "late notice" defense because it cannot prove it was prejudiced by the fact it did not receive notice of the Hug lawsuit until 2007. Pl.'s Mem. in Opp. at 12–13. Courts applying Massachusetts law, however, have explicitly held that the "prejudice" requirement of which Gargano speaks is applicable *only* to "occurrence" policies, *not* to "claims made and reported" policies. *Chas T. Main*, 406 Mass. at 865–66, 551 N.E.2d 28. In the context of a "claims made and reported" policy, an insured's failure to report the claim during the policy term is sufficient, standing alone, to permit the insurer to deny coverage. *See id.*; *see also Talcott*, 931 F.2d at 168.

Gargano also argues that NCMIC should not be permitted to rely on the

fraud exclusion because the Superior Court judgment is "factually and legally untenable." Pl.'s Mem. in Opp. at 14; *see also id.* at 13 (arguing that "the factual basis of the Hug Judgment . . . is seriously in question," that Hug had no legal basis for recovery, and that the Superior Court "imposed unreasonably and excessively high damages"). Aside from the fact that this lawsuit is not the proper vehicle by which to litigate the propriety of the factual[10] and legal conclusions reached by the Superior Court, the NCMIC policy excludes coverage for any claim in which fraudulent or dishonest conduct is *alleged*. Thus, whether or not the factual findings of the Superior Court are correct is not the issue; the issue is that Hug alleged that Gargano and the Firm engaged in a variety of dishonest and fraudulent actions. These allegations, *standing alone*, are sufficient to exclude Gargano's claim from coverage under the terms of the NCMIC policy.

Accordingly, the motion to dismiss the breach of contract claim against NCMIC, reflected in count III of the claim, is granted.

### 3. Liberty

■ The Liberty policy was in effect from September 1, 2006 until September 1, 2007. Liberty unquestionably was notified of the Hug lawsuit during the term of its policy when Gargano contacted it after the judgment was entered in July 2007, satisfying one of the two requirements for coverage under its "claims made and reported" policy. Gargano, however, must also show that Hug "first made" his claim against Gargano during the term of the

---

**10.** It is especially interesting that Gargano now attempts to attack the factual conclusions reached by the Superior Court given that his failure to present witnesses or otherwise respond to Hug's assertions led the Superior Court to characterize Hug's testimony and allegations as "essentially uncontested." *Hug*, 2007 WL 4358191, at *1 n. 2.

policy period in order to receive coverage. Liberty Policy at 8.

This Gargano cannot do. The Liberty policy explicitly defines "claim" to mean "a demand received by [the insured] for money or services, *including the service of suit.*" Liberty Policy at 9 (emphasis added). Accordingly, under the plain language of the policy, Hug's claim was made in 2005 when he served Gargano with the suit filed in Superior Court. This, meanwhile, clearly falls outside the Liberty policy's coverage, which did not commence until 2006. Accordingly, because the Hug claim was not *both* made *and* reported during the term of the Liberty policy, Liberty has no contractual obligation to provide coverage.

Furthermore, like the previous two policies, the Liberty policy contains an exclusion which states coverage will not be provided for "any judgment or final adjudication based upon, arising out of or in any way related to any dishonest, fraudulent, criminal, malicious, or deliberately wrongful acts or omissions committed by the [insured]." Liberty Policy at 12. Insofar as the Superior Court judgment is based upon the Court's factual findings that Gargano engaged in dishonest and fraudulent conduct, Liberty is relieved from indemnifying Gargano against the judgment or providing any defense in the appeal.

Accordingly, the breach of contract claim against Liberty, reflected in count I of the complaint, is dismissed.

## C. Chapter 93A

It appears there are two possible bases for the Defendants' chapter 93A liability: (1) breach of contract and (2) a violation of chapter 176D section 3. As discussed above, however, none of the Defendants have a contractual obligation to provide Gargano with coverage in relation to the Hug matter. Accordingly, chapter 176D section 3 provides the only theoretical basis upon which Gargano might recover.

A review of chapter 176D section 3 reveals only two categories of actions that might possibly apply to the instant case: (1) refusal to pay claims without conducting a reasonable investigation or (2) failing to settle if liability is clear.[11] Neither of these, however, is applicable to the instant case. Taking the latter provision first, the discussion above makes obvious that the liability of the insurers is far from clear; if anything, it is plain that they are not liable.

As to the former provision regarding investigation, Gargano asserts that the Defendants should have conducted an investigation into the factual circumstances of Hug's complaint before denying coverage. Pl.'s Mem. in Opp. at 11–12. There are, however, two responses to this. First, the proposition (and authority for it) relied upon by Gargano—that a failure to investigate the claim before denying coverage due to late notice equals bad faith—is applicable only to "occurrence" polices, not "claims made and reported" policies. As discussed above, Massachusetts courts have recognized the validity of "claims made and reported" policies and held that the only fact that must be demonstrated in order to permit an insurer to deny coverage under this type of policy is that the claim was not made or reported during the policy period. Second, it would be counterintuitive to require the Defendants to undertake the time and expense of investigating the Hug matter when it is clear, as

---

11. The remainder of the conduct identified in the statute involves scenarios, such as adver-

tising, not at all implicated by the instant suit.

discussed above, that the claim is ineligible for coverage regardless of the circumstances surrounding the lawsuit.

For the foregoing reasons, the chapter 93A claims against the Defendants, reflected in counts VII, VIII, and IX of the complaint, are dismissed.

## III. CONCLUSION

The Defendants' motions to dismiss [Docs. 8, 9, & 12] are GRANTED. Gargano's motion to reconsider the denial of his motion for leave to amend [Doc. 34] is DENIED. In addition, the Court rejects Gargano's recently filed "Notice of Removal," [Doc. 33], in which he asks this Court to remove the lawsuit brought against him by Hug from the Massachusetts state courts and to join it with this case. This request is wholly improper for a variety of reasons, not the least of which being that a final judgment has issued in the Hug suit. If Gargano takes issue with either the factual findings or legal conclusions reached by the Superior Court—as he apparently does—the proper course is to seek review by the Massachusetts Appeals Court, not a federal district court.

Finally, in light of the factual findings as to Gargano's fraud rendered by the Superior Court, a copy of this opinion will be forwarded to the Massachusetts Board of Bar Overseers for such action as it may deem appropriate.

**SO ORDERED.**